UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Jonah Holbrook, | : | Case No. 1:14-cv-776 |
| Plaintiff, | : | |
| vs. | : | |
| Stephanie Dumas, | : | |
| Defendant. | : | |

## ORDER

Before the Court are the parties' cross-motions for summary judgment. (Docs. 22 and 23) Both parties seek judgment on Plaintiff's one-count complaint brought under 42 U.S.C. §1983, alleging wrongful retaliation by Defendant in violation of Plaintiff's First Amendment rights to free speech. Both motions are fully briefed and ripe for decision.

For the following reasons, the Court will deny Plaintiff's motion and will grant Defendant's motion.

## FACTUAL BACKGROUND

Most of the relevant facts are undisputed, and the rest are construed in the light most favorable to Holbrook. Jonah Holbrook was employed by the Village of Lincoln Heights, Ohio in 2007 as a firefighter. Stephanie Dumas, the Village Manager, promoted him to Fire Chief in December 2013. On July 22, 2014, Dumas received a letter from the Village's liability insurance provider, the Public Entities Pool of Ohio, informing her that due to the number of claims against the Village and the amounts paid by the Pool on those claims over the past 14 years, the Pool was terminating the Village's membership effective October 2, 2014. Dumas met with Holbrook on Friday,

July 25 and they discussed the Pool's letter. Dumas expressed concern over the possible loss of insurance coverage, as the Village could not keep the Fire Department open; she also expressed concern about finding replacement coverage. After she met with Holbrook, Dumas distributed a copy of the Pool's letter to Village officials that included the Mayor, elected Council members, the police chief and Holbrook, with an email that said: "Good Evening, please see the attached information. I'll talk more on Monday." (Doc. 19-1, Holbrook Dep. Ex. 2)

The next day, Saturday July 26, at 7:13 p.m., Holbrook forwarded Dumas' email and the Pool's letter to his firefighter employees, with a message that stated: "PLEASE TAKE THE TIME TO READ THE ATTACHED LETTER! IF THE VILLAGE DOES NOT FIND ANOTHER INSURANCE CARRIER, WE COULD POTENTIALLY BE OUT OF A JOB, PER THE CONVERSATION I HAD WITH MS. DUMAS ON FRIDAY 7/25/14. PLEASE CALL ME OR EMAIL WITH ANY QUESTIONS. IF YOUR [sic] AVAILABLE ON MONDAY 7/28/14 AT 6:30PM, PLEASE COME TO THE COUNCIL MEETING! THANKS." (emphasis in original) Holbrook signed his email, "Jonah W. Holbrook, Fire Chief, Lincoln Heights Fire/EMS." (Doc. 19-1, Holbrook Dep. Ex. F)

On Monday, July 28, the Village Council met for a regularly scheduled meeting that was open to the public and broadcast on a local cable station. Holbrook attended the meeting. At the request of Village Solicitor Desai, Dumas announced the receipt of the Pool's letter, and told Council that the primary reason for the termination was the number of lawsuits filed against the Village since 2000. (Doc. 21-3) The meeting minutes reflect that the Mayor asked Dumas what the Village could do to lessen the risks posed by lawsuits; Dumas responded that the Pool already knew of the changes

and improvements the Village had made in areas of public safety, and in hiring and firing employees. (Id.) The minutes do not reflect any further discussion on the topic.

A few days later, on July 30, Holbrook posted a message on his Facebook page that stated:

> To all of the current/past employees who support the fire department. As some of you may know, the fire department, police department and maintenance department are in jeopardy. Due to insurance related issues that were made public at last Monday's (7/28) council meeting. Council has the meetings recorded by video and there is online access, but I do not know the site. As of now, there is a chance the departments will face even more severe issues, as of October 2nd, 2014 if they cannot find another insurance company.

(Doc. 19-1, Holbrook Dep. Ex. B, CM/ECF PAGEID 137)

Holbrook also discussed the issue with a personal friend, an Assistant Fire Chief for a nearby city's fire department. (Doc. 19-1, Holbrook Dep. at 62)

Dumas met with Holbrook again on August 5 and asked him whether he had distributed the Pool's letter to the Fire Department employees. Holbrook admitted that he had done so, and Dumas told Holbrook that she wanted him to provide written answers to questions about the matter. She also told him that she intended to ask for his resignation once he provided those answers. Dumas sent him the questions on August 7. (Doc. 19-1, Holbrook Dep. Ex. B) The questions generally asked Holbrook to identify who he told about the Pool's letter, to whom he had given a copy of the letter, how he communicated with those he talked to, and the specific details of what he said. Holbrook responded in writing to Dumas' questions the next day, and also wrote a letter to Mayor Mitchell, lodging a formal complaint about Dumas. Holbrook told Mitchell that during the initial conversation on July 25, Dumas had mentioned the possibility of the

-3-

Village fire, police and maintenance employees losing their jobs as of October 2, but he had assumed during that discussion that Village administration positions would not be affected.  He also told Mitchell:

> I sent [the letter and emails] to the employees as I felt it was their right to know the conversation that the Manager and I had spoken of.  For many fire departments across the nation, it can take 2 months to a year to find another position.  I have admitted to telling the employees about the letter, in fact I sent the email to all of them because I have no knowledge of any reason behind not telling them, such as this being a 'classified' document.
>
> On Tuesday 8/5/2014 the manager and I have a brief discussion in her office and she lightly spoke if what I have done and I immediately stated I did exactly what she was stating. [sic]  She continued to state, she would ask for my resignation once she received my reply to her answers.  I believe this is wrong in so many ways, because the manager told me directly; there was a possibility of the employees losing their positions upon the October 2nd deadline.  I have to play both Fireman and Chief to my employees.  And the majority of the fire department has a family style household.  And due to the decreased economy, I felt it was their right to know of the possibility they may lose their jobs. ... Also I have admitted to [informing] the employees of the possibility of losing their positions, because I would be including in this loss.  My family would be significantly affected as well. ...

(Holbrook Dep. Ex. C, PAGEID 139-140)

On Tuesday, August 12, Holbrook received a certified letter from Dumas, stating that he was suspended with pay effective August 11.  Holbrook spoke to Dumas by telephone that day, and he agreed to meet with her on August 15.  However, on August 15, Dumas cancelled that meeting and told Holbrook by telephone that he was terminated.  That afternoon, he met with Dumas to turn in his badge and keys, and then returned his department-issued equipment.

On August 26, Dumas sent a letter to Holbrook confirming that he was terminated from his position, and to state "some, but not necessarily all" of the reasons

for that termination, which included:

   1. Emails regarding the delivery of the ambulance run Report to the Police Department.

   2. Text to Fire Department personnel informing them they would not have a job effective October 2, 2014.

   3. Post on Facebook indicating Fire Department personnel would not have a job as of October 2, 2014.

   4. Discussion with Chief of Wyoming Fire Department indicating the Fire Department would not exist after October 2, 2014.

   5. Bomb threat.

Dumas stated that this conduct amounted to disruptive activity in the workplace; insubordination and other disrespectful conduct; unauthorized disclosure of confidential information; and unsatisfactory performance or conduct.  (Holbrook Dep Ex. F, PAGEID 152-153)

Holbrook filed a charge of discrimination with the Ohio Civil Rights Commission on August 18, 2014.  He alleged that he was the first Caucasian fire chief employed by the Village; that Mayor Mitchell and Manager Dumas were both African American females; and that they discriminated and retaliated against him based on his race and sex.  (Holbrook Dep Ex. G, PAGEID 154)   He filed his single-count complaint in this case on October 2, 2014, alleging that Dumas terminated him for exercising his First Amendment right to speak about an issue of public concern.  (Doc. 1)

## DISCUSSION

Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," and must make an affirmative showing with proper evidence in order to defeat the motion. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must construe the record in the light most favorable to the non-movant, and draw all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other

words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

First Amendment Retaliation

The parties agree on the applicable standard for a Section 1983 claim.  Holbrook must show that (1) Dumas acted under color of state law, and (2) her conduct violated Holbrook's federal constitutional rights.  In order to show a violation, Holbrook must prove: (1) he engaged in speech or conduct protected by the First Amendment; (2) an adverse action was taken against him; and (3) a causal connection exists between his speech and the adverse action, his termination.  Only the first factor is disputed.

The determinative question is whether Holbrook's speech and conduct regarding the Pool's letter to the Village is protected by the Free Speech clause of the First Amendment.  The answer to that question is guided by Supreme Court cases defining the contours of the free speech rights of public employees: does the speech involve a "matter of public concern" (Connick v. Myers, 461 U.S. 138 (1983)); and is the speech made by the employee as a private citizen and not pursuant to the employee's official duties (Garcetti v. Ceballos, 547 U.S. 410, 413-414 (2006)).  If both these are true, the court applies a balancing test to determine whose interests should prevail in any given situation (Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  See Evans-Marshall v. Bd. of Ed. of Tipp City, 624 F.3d 332, 338 (6th Cir. 2010), articulating this three-step analysis.  These are issues of law for the court to decide where, as here, there is no substantial dispute about whether the speech occurred, what was said, or the causal

link between the speech and the adverse action.  Farhat v. Jopke, 370 F.3d 580, 589-593 (6th Cir. 2004).

In Connick, the Supreme Court observed that government employers are given "wide latitude in managing their offices" and their decisions "are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable."  461 U.S. at 146 (citations omitted).  Of course public employees do not sacrifice their constitutional rights simply by virtue of their employment.  But "... when a public employee speaks out not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision ...".   Whether an employee's speech addresses a matter of public concern depends on whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the  community," determined by "the content, form, and context of a given statement, as revealed by the whole record."  Id. at 147-48.

In Garcetti, the plaintiff (Ceballos) was an assistant district attorney and calendar deputy who exercised supervisory responsibilities over other lawyers in the DA's office.  An attorney representing a criminal defendant contacted Ceballos, saying he intended to file a motion challenging a search warrant affidavit.  He asked Ceballos to review the case.  Ceballos then read the affidavit in question, spoke to the affiant (a sheriff's deputy), and investigated the site of the search.  Ceballos concluded that the affidavit contained misrepresentations, and he wrote a memo to his supervisors recommending that the criminal case be dismissed.  A subsequent meeting between Ceballos and his

supervisors, and the warrant affiant and several sheriff's employees, became rather heated after a sheriff's lieutenant criticized Ceballos' involvement in the case. The district attorney rejected Ceballos' recommendation and proceeded with the prosecution; in a subsequent hearing challenging the search warrant, Ceballos was called by defense counsel to testify about his concerns about the affidavit. Ceballos was later reassigned to a different position, transferred to a different courthouse, and denied a promotion.

Ceballos filed a lawsuit alleging these actions were unlawful retaliation for his protected speech. His lawsuit was dismissed by the district court, which concluded that his speech was not protected by the First Amendment, a result eventually affirmed by the Supreme Court. The Court held that Ceballos' memo was written as part of his duties as a prosecutor and calendar deputy: "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created ...". Id. at 421-422. The court also observed: "Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission. Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. If Ceballos' superiors thought his memo was inflammatory or misguided, they had the

authority to take proper corrective action." Id. at 423-424.

Here, Holbrook's July 26 email was sent to the firefighters he supervised, and warned them that they "could potentially be out of a job" if replacement coverage was not obtained. He signed the email as "Fire Chief." His Facebook posting on July 31 was first addressed to all "current/past employees" of the fire department. In his letter to Mayor Mitchell, Holbrook admitted that he sent the email to his employees because he "felt it was their right to know" about the potential for losing their jobs; he also mentioned that he and his employees had families to support, and that it could be difficult to find another job quickly. He told the Mayor that his job required him to "play both Fireman and Chief" to his employees. The Court must conclude that Holbrook was not commenting on the issue of the Village's insurance coverage, as he suggests in his motion. And there is nothing in the email suggesting a critique of Village administration or budgets as he also suggests. The context and content of his communication lead to the conclusion that he informed his employees because he thought they had a "right to know" about the possible loss of their jobs.

Holbrook also contends that his job duties did not include communicating with other employees about insurance coverage issues. But that fact is not dispositive, especially in view of what Holbrook actually said in his email. "Speech by a public employee made pursuant to ad hoc or de facto duties not appearing in any written job description is nevertheless not protected if it 'owes its existence to [the speaker's] professional responsibilities.'" Weisbarth v. Geauga Park Dist., 499 F.3d 538, 544 (6th Cir. 2007)(quoting Garcetti), finding that a park ranger's statements about morale and performance issues to an outside consultant hired by her employer were made pursuant

to her official duties, even though the interview was an ad hoc duty and not part of her official job description.

In contrast is <u>Westmoreland v. Sutherland</u>, 662 F.3d 714 (6th Cir. 2011). There the plaintiff was a member of a city's fire department and had been the head of the department's rescue dive team, which the city counsel disbanded. Sometime later, a young boy drowned in a local lake. Westmoreland appeared at a city council meeting, off duty and not in uniform, and harshly criticized the City's decision to disband the team, asserting that the dive team could have saved the boy. The City's Mayor concluded his statements amounted to insubordination and conduct unbecoming an officer, and he was disciplined. The district court found that his statements were on a matter of public concern and that plaintiff spoke "as a citizen," not as an employee. Therefore his speech was protected by the First Amendment. (The district court also concluded that his statements were knowingly false and reckless in essentially accusing the City Council of causing the boy's death, and granted judgment to the City on that basis.) The Sixth Circuit agreed that Westmoreland's speech was protected by the First Amendment: "Although plaintiff identified himself as a public employee, he appeared off duty, out of uniform, and at a public meeting to address the Mayor and City Council during the public comment period. Nothing in the record supports the claim that plaintiff's expression was made pursuant to a task that was within the scope of his official duties." <u>Id</u>. at 719. The court of appeals reversed the grant of summary judgment, finding disputed issues of fact about whether Westmoreland knowingly made false and reckless statements.

If Holbrook had appeared at the City Council meeting, off duty and not in uniform,

and publicly commented about ramifications on his department of a potential loss of insurance coverage, his situation would be much closer to that in Westmoreland. But Holbrook distributed an email to his employees using his official Village email account. He understood that Dumas shared the information with him because he was the Fire Chief. He then posted a message to his Facebook page, again stating that his department (and others) "are in jeopardy." Holbrook does not contend that his Facebook page is a forum generally open to the public; and his posting was addressed primarily to current and former Fire Department employees.

Holbrook responds that Dumas herself circulated the Pool's letter to Holbrook and Village Council members, negating any suggestion that the information was confidential or that Holbrook should not have informed his employees about it. He also notes that the concerns he expressed to his employees actually came to pass in October, when the Village had to close the fire department for 24 hours until new coverage was in place. Dumas made the insurance situation public at the July 28 council meeting. But the fact that the situation was discussed at a Council meeting, or that Dumas circulated the letter to elected Council members and department heads, does not determine whether Holbrook's **own** communication to his employees was protected. He concedes that "the critical factor is whether the public employee was speaking pursuant to the official duties of his position. If so, the employee is not speaking as a citizen and is subject to employer discipline." (Doc. 27 at 4, citing Garcetti, 547 U.S. at 421.) The truth of Holbrook's statements about the Village's insurance coverage are not directly relevant to this question. And there is no dispute that the Village actually received the Pool's letter and that the Pool intended to

terminate its coverage. No one has suggested that Holbrook made a maliciously false statement on that topic.

He also argues that his speech is protected even though he learned about the insurance situation at his workplace. He relies on Lane v. Franks, 134 S.Ct. 2369 (2014), where the Supreme Court concluded that the Eleventh Circuit had interpreted Garcetti too broadly in dismissing plaintiff's First Amendment claims. Lane was the director of a youth program at a community college in Alabama. Part of his duties included managing finances of the program, which were facing difficulties. When he audited the program's expenses, he discovered that an elected state representative was on the payroll of the program but had not been reporting to her office or performing her program duties. He instructed her to appear and perform the duties and she refused. Lane then fired her, and she told another program employee that she intended to "get back" at Lane.

Her termination attracted press coverage as well as an FBI investigation (the program received federal funds). Lane was subpoenaed to testify before a federal grand jury, which indicted the representative on four counts of mail fraud and theft of funds from a federal program. Lane was also subpoenaed to testify at her trial, and she was eventually found guilty by a jury. About six months later, Lane was terminated from his job, and he brought claims against the president of the college who fired him, alleging First Amendment retaliation. The district court granted summary judgment to the president, and found no violation of clearly established law because Lane learned about the matters he testified to in the course of his employment, relying on Garcetti.

The Supreme Court reversed, finding that the First Amendment "protects a public

employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities." Id. at 2378.  And it rejected the appellate court's finding that Lane did not speak as a citizen because he learned about the subject of his testimony in the course of his employment.  The critical question "... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id. at 2379.  Here, there is no dispute that Holbrook learned about the insurance situation as a result of his position as Fire Chief.  But the determinative question is not **how** he learned the information, but what he said, where and how he said it, and when he spoke about that information.  His own words in the email demonstrate that he communicated the information to his fireman because he was their chief, and he felt he had an obligation to inform them of the situation and that they could be without a job in the near future.

      Holbrook rejects Dumas' suggestion that because he spoke out of a concern for his own (and his employees') jobs, his speech was not protected.  Holbrook cites Chappel v. Montgomery County Fire Prot. Dist. No. 1, 131 F.3d 564 (6th Cir. 1997), which held that the plaintiff's motive in speaking is not dispositive of whether his speech is about a matter of public concern.  The Sixth Circuit rejected the defendants' arguments in that case that an employee's speech at public board meetings about mismanagement and misappropriation of funds by the fire board's chief and his family members was not protected, because the employee wanted a job at an expanded EMS division of the department.  The alleged financial mismanagement had delayed the department's expansion to offer EMS services.  The court cited Connick, which

> ... instructs us that 'whether an employee's speech addresses a matter of

> public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. ... It does not instruct us to examine the content, form, and context of the statement merely to determine the motive of the speaker, just as it does not instruct us to determine whether the speaker has addressed a matter of public concern by merely attempting to discern the speaker's motive. Motive is a relevant, but not necessarily dispositive factor in determining whether the speech is a matter of public concern.

Chappel, 131 F.3d at 576 (internal quotations omitted). The Court does not find Holbrook's speech unprotected because his motive may have been to protect his employees' jobs or his own job. The issue is determined, as Chappel plainly held, by the "content, form, and context" of Holbrook's speech. The Court can only conclude that the content and context of his email and Facebook post lead to the clear conclusion that he was speaking to his employees on a personnel issue, and not on a matter of public concern. As Garcetti held, if Dumas found his email inflammatory or misguided, she had the authority to take corrective action.

Even assuming that Holbrook's email to his employees and his subsequent Facebook post relate to a general matter of public concern - the possible loss of the Village's liability insurance - the Court must then balance Holbrook's interest in speaking with the interests of the Village (acting through its Manager, Dumas) in "promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568 (1968). Factors the Court should consider include whether the speech "meaningfully interfere[d] with the performance of [Plaintiffs'] duties, undermine[d] a legitimate goal or mission of the employer, create[d] disharmony among co-workers, impair[ed] discipline by superiors, or destroy[ed] the relationship of loyalty and trust required of confidential employees." Kindle v. City of Jeffersontown, 374 Fed.

Appx. 562, 568 (6th Cir. 2010), quoting Williams v. Commonwealth of Ky., 24 F.3d 1526, 1536 (6th Cir. 1994).

Dumas's termination letter stated that Holbrook's conduct was disruptive, and constituted unsatisfactory performance or conduct.  She argues that Holbrook's email and postings disrupted morale and caused alarm, and led to some employees actually resigning from the Fire Department.  Holbrook disputes these contentions.  But in his deposition, he admitted that his decision to send the email to all of his employees affected their morale.  He also admitted that some of his firefighters started looking for other jobs, and that some of them left the department.  (Doc.19-1, Holbrook Dep. at 40, PAGEID 123.)  The context and the tone of his email, together with his concessions about the effect it had, support Dumas' contention that the Village's interests in avoiding disharmony or disruption, and interfering with the loyalty and trust of its employees, outweigh Holbrook's interests in communicating in the fashion that he chose.

Finally, Dumas also argues that, even if Holbrook's speech and conduct were constitutionally protected and outweighed the interests of his employer, she is entitled to qualified immunity from his claim which is brought against her in her personal capacity only.  (Holbrook's complaint does not seek injunctive relief or reinstatement, and seeks compensatory and punitive damages against Dumas.)   The Supreme Court has held that qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  Lane v. Franks, 134 S.Ct. at 2381, quoting Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2085 (2011).  In Lane, the Supreme Court held that the president of the college who terminated the plaintiff was entitled to qualified immunity from plaintiff's damages claims against him in his

personal capacity. The Court cited Eleventh Circuit precedent which was mixed on whether an employee's subpoenaed testimony was protected by the First Amendment.

Here, Dumas argues that neither the Supreme Court nor the Sixth Circuit has clearly extended First Amendment protection to an employee-supervisor who communicates departmental information to his employee-subordinates. Indeed, the Sixth Circuit recently noted that after Garcetti, it has often found that an employee's "inherent duty of internal communication" renders speech **unprotected**, as it "owed its existence to professional responsibilities..." even though it may not be a regular or routine part of the plaintiff's job. See Boulton v. Swanson, 795 F.3d 526, 533 (6th Cir. 2015), where the court also observed that the task of determining if speech is protected "has proven challenging" to the courts. The court cited Weisbarth v. Geauga Park Dept., 499 F.3d 538 (6th Cir. 2007)(park ranger's statements to departmental consultant were not protected, as they were de facto duties of her position); Haynes v. City of Circleville, Ohio, 474 F.3d 357, 364 (6th Cir. 2007) (a police officer's memo to his chief objecting to a staff reduction was not protected); and Fox v. Traverse City Area Pub. Sch. Bd. Of Educ., 605 F.3d 345, 348-349 (6th Cir. 2010) (a teacher's complaints that her classes were too large and hindered learning were not protected). The Court sees nothing in any of these cases that strongly suggests, much less clearly establishes, that Holbrook had a constitutional right to circulate an alarming email message to his employees, suggesting that they could soon lose their jobs.

Even if Holbrook's speech or conduct is entitled to First Amendment protection, the Court concludes that Dumas is entitled to qualified immunity from Holbrook's Section 1983 claim brought against her in her personal capacity.

**CONCLUSION**

For all of the foregoing reasons, the Court denies Holbrook's motion for summary judgment (Doc. 22), and grants Dumas's motion for summary judgment (Doc. 23). Holbrook's complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: November 2, 2015                    s/Sandra S. Beckwith
                                           Sandra S. Beckwith, Senior Judge
                                           United States District Court